The executors of JAMES A. EVERETT, plaintiffs in error, vs. The administrators of ELIZABETH WHITFIELD, defendant in error.

Although time may be running against an equitable title, yet, if that title comes to an infant, time will cease to run against it, during the infancy; equity in this respect, following the statute of 1817.

As to when the evidence is sufficient to warrant particular charges.

In Equity, in Houston Superior Court. Tried before Judge LAMAR, at October Term, 1858.

This cause came before the Supreme Court upon the following bill of exceptions:

Be it remembered, that on Monday the first day of November, 1858, during the regular October Term of Houston Superior Court, the honorable Henry G. Lamar, Judge of said Court, then and there presiding—the cause of Adolphus D. Kendrick and Myles L. Green, as executors of the last will and testament of James A. Everett, late of Houston county, deceased, against Henry H. Whitfield, as administrator of Elizabeth Whitfield, deceased, the same being a bill to enjoin a common law action, and to quiet complainant's possession to the property therein specified—came on to be tried, was called in its order on the appeal docket, both parties announced ready, a jury was empannelled, and the parties were at issue before a special jury. By consent, the common law action and the bill were tried together. Complainants, after the reading of the bill and answers, submitted in evidence, (having laid a good foundation therefor,) a bill of sale from Joseph Mims, Sheriff of Houston county, dated 6th day of March, 1828, to James A. Everett, for thirty-two negroes, a copy of which bill of sale is as follows:

GEORGIA, Houston County—Know all men by these presents, that Joseph Mims, Esquire, Sheriff of Houston county, for and in consideration of the sum of six thousand seven

hundred and ninety-one dollars, to him in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, hath bargained and sold, and by these presents, and by virtue of the powers in him vested as Sheriff aforesaid, and of an execution issuing out of the Superior Court of the county of Putnam, bearing date, the fourth day of October, eighteen hundred and twenty-five, which the executors and executrix of Stephen W. Harris, deceased, plaintiff, and George B. Whitfield, defendant; and several other *fi. fas.* vs. said Whitfield, I, Joseph Mims, Sheriff, as aforesaid, doth bargain and sell unto James A. Everett, of the county of Crawford, and State aforesaid, thirty-two negroes, namely; Dick, a man; Ralph, a man; Bob, a man; Dempsey, a man; Simon, a man; Isaac, a boy; Sharper, a boy; Patrick, a boy; Mose, a boy; Orange, a boy; Emily, woman, and child Taby, a girl; Fillis, a girl; Minny, a girl; Sarah, a girl; Alsy, a girl; Hanner, a girl; Lydia, a girl; Violet, a girl; Lynda, a girl; Ginney, a girl; Biner, a girl; Hester, a girl; Letty, a girl; Patty, a girl; Feeby, a girl; Jude, a girl, which I, Joseph Mims, Sheriff, did this day expose at public outcry, under the execution aforesaid, and the said James A. Everett being the highest and best bidder, was knocked off to him at the price or sum of six thousand seven hundred and ninety-one dollars. To have and hold the negroes aforesaid, unto the said James A. Everett, his heirs and assigns forever, as they were held by the said George B. Whitfield.

In witness whereof, the said Joseph Mims, Sheriff aforesaid, hath hereunto set his hand and seal, this 6th day of May, 1828. (Signed,)    JOSEPH MIMS, *Sheriff*, [*L. S.*] In presence of

SIMON BATEMAN,
EDW'D WELCH, *C. S. C. H. C.*

GEORGIA, Houston County—Clerk's office, Superior Court. Recorded in book I., page 592, this April 25th, 1854.

WM. H. MILLER, *Clerk.*

Ex'ors of Everett vs Adm'rs of Whitfield.

Complainants then read in evidence, an execution of which the following is a copy :

GEORGIA, Putnam County—To all and singular the Sheriffs of said State, greeting:

We command you, that of the goods and chattels, lands and tenements of George B. Whitfield, you cause to be made the sum of six hundred and fourteen dollars and eleven cents, principal, and the further sum of one hundred and thirty-nine dollars and seventy cents interest, up to the 25th day of March, 1827, and the further sum of thirteen dollars twelve and a half cents, for cost, with interest, and the principal sum from the 25th day of March, 1827, which Daniel Parish, William S. Miller, Henry Parish, Joseph Kernochan, and Ephraim Holbrook, late trading under the name and style of Parish, Miller & Co., lately in our Superior Court of said county, recovered against him for their principal, interest and cost: And that you have said several sums of money before the Judge of said Court, on the third Monday in September next, to render to the said Parish, Miller & Co., the principal, interest and cost aforesaid ; and have you then nd there this writ.

Witness, the honorable Owen H. Kenan, Judge of said Court, this 7th day of April, 1827.

(Signed,)          WILEY WILSON, *Clerk.*

*Entries on the said fi. fa.*

Levied the within on four hundred and five acres of land, more or less, whereon defendant now lives, 3d December, 1827.          H. W. RALEY, *Sheriff.*

The above levy sold 1st day of January, 1828, for ninety-one dollars, and the money paid to a *fi. fa.* of older date than the within *fi. fa.,* this 1st January, 1828.

H. W. RALEY, *Sheriff.*

Levied the within *fi. fa.* on thirty-two negroes, March 10, 1828.          JOSEPH MIMS, *Sheriff.*

The above levy sold on the first Tuesday, in this instance

for $6,791, and the whole of the money paid to older *fi. fas.*
14th May, 1828.          JOSEPH MIMS, *Sheriff.*

Levied the within *fi. fas.* on 2,323 acres of land, lying on
Flint river, 10th June, 1828.

JOSEPH MIMS, *Sheriff.*

The above levy sold for eleven dollars, the money paid for
cost.          JOSEPH MIMS, *Sheriff.*

Complainants then read in evidence the exemplification
and exhibits from Putnam Superior Court, and from the exe-
cution docket of Putnam Superior Court, all of which are
attached to the bill as a part of the pleadings, and which
plaintiffs in error pray leave to refer to as part of the evi-
dence to be considered as embodied herein.

Complainants also read in evidence, a copy of the last will
and testament of James A. Everett, also exhibited to the bill
as part of the pleading, and which they also pray leave to
refer to as though embodied herein.

It having been omitted in the proper place, complainants,
before reading in evidence the bill of sale from Joseph Mims,
Sheriff, to James A. Everett, showed diligence and exhaust-
ed all the resources in their power, to produce the original *fi.
fa.* of the executors and executrix of Stephen W. Harris vs.
George B. Whitfield, and after said proof of diligence, the
Court allowed said bill of sale, and the exemplification and
records of Putnam, attached to the bill to be read in evi-
dence.

Complainants then read in evidence the depositions of
John Hiley, taken by commission, who testified he knew the
parties, and knew George B. Whitfield. First acquaintance
with him was sometime during the year 1828. At first, it
was casual, afterwards intimate. He lived a little over a
mile from me. That he knows nothing about the negroes
having been in the custody of the Sheriff of Houston coun-
ty. I do not know that I know the names of any of the
negroes at issue between the parties, but one of the negroes

Ex'ors of Everett vs. Adm'rs of Whitfield.

that belonged to George B. Whitfield was named Ralph, pronounced commonly Rafe, another name was Dick. I do not now remember any other names, though I might remember others by long study. The negroes remained in Whitfield's possession until after the crop of 1828 was gathered. Mr. James A. Everett then sent his wagon after them and took them away peaceably and quietly. I was present at the time. I went to do blacksmith work for myself I saw Mrs. Whitfield there, but did not see Mr. Whitfield. So far as I know, Mr. James A. Everett exercised and claimed control of the negroes ever afterwards. As well as I recollect, George B. Whitfield lived in the neighborhood about four years after he parted with the possession of the negroes. He moved at first, I believe, to Henry county. The names of the negroes, and the circumstances under which they left, I have already stated as well as I can in answer to the fourth interrogatory. Has already stated these things in answer to the fourth direct interrogatory. Mr. Whitfield never expressed his feeling, or had any conversation with me about the transaction. Knows nothing about what part of the crop of 1828, Everett was to have. Mr. Whitfield was an intemperate man. I do not think any drunken man is capable of transacting his business when in a state of intoxication. Mr. Whitfield was a man, when sober, who knows how to attend to business. I know nothing about the sale. If Mr. Whitfield ever complained, he never did to me. Know nothing more that will benefit defendant.

Complainants then read in evidence the depositions of *William West*, who testifies as follows:

He knows the parties, and has heard Everett and Whitfield talk about trading, and the trade was about negroes. Witness does not recollect all that was said, but heard George B. Whitfield urge Everett to take up executions that were against him from Putnam county.

The above conversation was at Everett's house.

As near as witness recollects, Whitfield wanted Everett to

take up the executions and take a mortgage on his negroes. Witness says they were Whitfield's negroes. Witness did not hear anything about a sale of negroes between Everett and Whitfield. He did hear Whitfield urge Everett to take up said executions and take control of them; he heard nothing about selling property. What induced Whitfield to urge Everett to take up the executions, was that the Sheriff was after Whitfield's negroes or property, and he could not get the money to take up said executions—that was his reason for wanting Everett to take up said executions. Whitfield did propose to give Everett a mortgage on the negroes, but witness does not know whether he did, or did not. Witness did oversee for Everett in 1825, 1826, 1827, and six months of the year 1828. Witness had Mingo and Bob, that was of the Whitfield negroes. It was in the latter part of 1827 and 1828, he overseed there, a part of the time in the lower 14th, and a part of the time at the place where Everett lived. Everett bought Mingo and Bob at Sheriff's sale, does not recollect what month they were sold. Whitfield remained in the neighborhood after the sale—never heard of his setting up any claim to said negroes. Whitfield did get corn from Everett in 1826; he got 600 bushels, at $1 25 per bushel; does not know on what account it was got. Everett and Whitfield lived about four miles apart, does not know when Whitfield left the neighborhood, cannot say where he lived when the negroes were sold by the Sheriff.

Witness was born in North Carolina, in the year 1796. If you will subtract 1796 from 1856 you have my age. He lived in the lower 14th district Houston county, Ga. He is a farmer by occupation, has lived in this county about thirty-one years—he did oversee for Everett in the years 1825–6–7, and part of the year 1828; he gave me $200 a year. Witness lived on the Hog-crawl place a part of the time, and at the home place the balance of the time. At the Hog-crawl place he worked from five to ten hands, names are Peter, Ned, Hannah, Lucy, Chaney and Peter; then there was Bob

and Mingo, of the Whitfield stock, then there was Sandy, Larry and Pompey, and Peggy, then there was none of the Whitfield stock but Bob and Mingo. Witness did not sleep and eat in the same house with Everett, he only acted as overseer for Everett. Mr. Green did transact business for Everett, has heard a conversation between Everett and Whitfield, but nothing about the sale of negroes, do not recollect the time, the place was at Everett's house. There was no one present but Everett, Whitfield and myself; it was in the day time—does not recollect all that was said. Witness was at Mr. Everett's on business and found Whitfield there. Witness never heard Mrs. Elizabeth Whitfield's name mentioned. I heard them talk about a mortgage, but never heard that Everett had a mortgage on any negroes. Witness says he never heard Everett say anything about buying in the negroes for Whitfield—does not know where they went to— does not know anything about Green's going to Whitfield's and taking away the negroes in the absence of Whitfield, does not know anything about Whitfield's being displeased and threatening to kill Everett. Witness never saw Whitfield intoxicated, does not know anything about Everett's getting Wm. Whitfield to live with him in Fort Valley. All told that witness knows.

Complainants then read in evidence, the depositions of Jefferson J. Westberry, taken by defendant, who testified, he knew the parties, and he did manage the plantation of James A. Everett in his lifetime for nine years. I knew negroes on his, Everett's plantation, called by him and others, the Whitfield negroes, the names of many of them, as well as their ages, I have forgotten; but I give the following names of such as I can remember. Lidd, Senior, Dick, Bob, Dempsey, Ailsey, Mingo, Sarah, Emily, Violett, Jude, Plym, Philis, Biner, Tabby, Patty, and a child of Sarah, and Lett and Charity, children of Mingo; there were others, children of these negroes, but the names of them I disremember. Lidd, the younger, Stephen, Orange or Mack and Mose. I do not

remember any of their ages positively, I cannot give the value of the negroes or their hire, having been unacquainted with them for several years past. I do not know how Everett got possession of said negroes. I do not know anything more that will benefit the defendant. I have not said what any one said about any negroes. I overseed or managed for James A. Everett, except what he (Everett) himself said. I suppose, from Mr. Everett's calling certain negroes the Whitfield negroes, that those negroes had once belonged to Whitfield. I am unable to state fully, any conversation that passed between me and Everett, but I remember hearing Everett say he bought said negroes at Sheriff's sale, and that they were sold as the property of Whitfield. I overseed for James A. Everett at one time, seven years, commencing in December, 1832, and leaving there on or about the 1st of January, 1840. I was then absent from his plantation for two years, when I came back and overseed for him for one year and ten months. I did not know G. B. Whitfield, and consequently, know nothing of his ever having lived East of Flint river, or of his being rational or irrational. I know nothing more that will benefit Everett's executors. Here complainants rested.

Defendant then read in evidence, his letters of administration on the estate of Elizabeth Whitfield, in the usual form, from the Ordinary of Putnam county, dated ———— 1853.

*Howell Cobb* introduced as a witness for defendant, testified: Col. Howell Cobb was present at the sale of the negroes, 6th May, 1828. His attention was called to the sale because the manner of the sale was unusual, and the negroes were not put up in the usual way, but all in a lump. Everett was the purchaser. There were a good many negroes, but how many, I do not know. He cannot say that those now in controversy were among them.

As to the objects of the sale and its unusual manner, he derived his information from Whitfield, of whom he inquir-

ed, because Whitfield had been his friend—although Everett was present on the ground—he could not say that he heard the explanation given by Whitfield. (The Court ruled that the sayings of Whitfield could not be given without it was proven that Everett heard them.) Where the negroes went after the sale, he did not notice. Don't know when Whitfield left the county, but he remained there several years after the sale. The negroes were sold in a lump. Does not know whether that (the lump) included the whole of the negroes, but knows that the lot was unusually large. It is not usual to put up negroes in families at Sheriff's sales—whether the negroes put up were one family, he does not know, but he thinks not.

Defendant then read in evidence the depositions of *Joel Branham, James Nicholson* and *William B. Carter*, all of whom testify they were acquainted with plaintiff, but not with defendant. James Nicholson answers, he knew Elizabeth Whitfield in her lifetime, that he knew her in Eatonton, this place, that she was then living with her son, George B. Whitfield, and that she died at his house, in this place, about the year 1825 or 1826, according to the best of his recollection. Joel Branham says he knew Mrs. Whitfield, that she lived and died as stated by James Nicholson, only his recollection is, she died in 1825.

Wm. B. Carter says he is not able, from his knowledge of the facts.

James Nicholson and Joel Branham answer, Mrs. Whitfield came to Georgia, and to this place, (Eatonton,) about the year 1825, and it was understood she came from S. Carolina. Joel Branham says she brought a considerable gang of negroes with her. Whether they were hers or not, he does not know. Does not remember how many, and does not know whether she died in possession of the said slaves or not. James Nicholson does not know anything of the facts jointly answered by Joel Branham and James Nicholson. William B. Carter knows nothing that will enable him to answer the

third direct interrogatory.   Joel  Branham and  James Nicholson say, George B. Whitfield did have a large estate at the time, and before his mother came to live with him, how many slaves, deponents do not remember—there was a considerable number.   Wm.  B.  Carter knows nothing of the facts enquired of in  this interrogatory.   The witnesses all answer, Wm. B. Carter is Ordinary of said county.   Wm. B. Carter answers, upon examination of the records in his office, he finds that administration has never been granted upon Elizabeth Whitfield's estate, except to Henry H. Whitfield.

Joel Branham and  James Nicholson answer that Elizabeth Whitfield came to Putnam county about the year 1825. That her son, George B. Whitfield, came first.   That she did live with her son, George.   That George was living here when she came out, and that he did not, as well as the witnesses recollect, come with her.   That George B. did come out to this  place, about the year 1823 or 1824.   Don't remember that he remained  one year and then went back after his mother and property.   Witness Branham only knows that she brought negroes with her.   Nicholson knows nothing.   Carter knows nothing of the  facts enquired about in this interrogatory.   Branham and  Nicholson  know not whether there were any other children, except George B. Whitfield.   Carter knows nothing.   They all answer, the tax books are not in their custody and that they cannot answer the question in this  interrogatory.   They have all answered all that they know.

The defendant then read in evidence, the depositions of *Edward Varner*, who testified :  He knew Elizabeth Whitfield in the county of Putnam.   I learned from Elizabeth Whitfield and her family that she came from South Carolina, or near the line of North Carolina.   Mrs.  Elizabeth Whitfield died in Putnam county.   I do not remember what time she died, but it was many  years ago.   She  lived  on a plantation in Putnam county, and had about twenty negroes, more or less, which were with her at the time of her death.

I only remember one of the negroes' names, and a negro by the name of Sharper, an old man. I knew George B. Whitfield in the county of Putnam. He had about him, near fifty negroes. I do not know what he was worth. George B. Whitfield, according to my understanding, was the only child of Elizabeth Whitfield at the time of her death. I do not know that George B. Whitfield was distributee of Elizabeth Whitfield, but suppose he was. I do not remember whether or not, she lived in the house with George B. Whitfield, but think she did not live in the same house. I do not know that George B. Whitfield did control the negroes on the plantation. I only know it by her having them in possession, when she moved into Putnam county. If she had any title but possession, I do not remember. I never saw any paper title. I never saw any paper title that I have any recollection of. I do not know that George B. Whitfield was the only heir or not, but suppose he was entitled to the property of his mother. In regard to the property's being sold, I know nothing more than report, and that was, the property was sold. George Whitfield died, I think, in Houston county. Have stated all I know about the property.

Answers of *Sarah Whitfield*, taken by commission. She answers: I know Miles L. Green and Henry H. Whitfield, but I do not know Adolphus D. Kendrick.

I knew Elizabeth Whitfield in her lifetime. I first became acquainted with her in 1820, in the State of South Carolina, and was well and intimately acquainted with her from that time until her death, which took place in the year 1825, in Eatonton, Putnam county, Georgia.

The said Elizabeth Whitfield did own and possess in her own right, in the State of South Carolina, land and negroes. I cannot state how much land she owned, but she owned and possessed sixteen negroes.

The said Elizabeth Whitfield did bring to Georgia with her, in the year 1824, the said sixteen negroes, and one more which was born on the road while she was moving to Geor-

gia, named Mose. The names of the sixteen negroes were, as well as I can remember, Hannah, Lid or Lidia, Binah, Stephen, Orange, Ailsy, Violet or Vilett, Jude, Plymouth, Juny, Unity, Ann, Taby, Jansey, Dempsey and Daniel. She did die in possession of all these slaves, seventeen in number, including the said Mose. I am the widow of George B. Whitfield, and we were married the 5th of October, 1820, and we did live together till his death, and he died the 1st day of April, 1839. We went to the State of South Carolina in October, 1820, and remained there until February or March, 1823, when we removed to this State. My husband always said he moved to Georgia to gratify me, as my parents and relations were all in Georgia, and I preferred living near them. He was a widower when I married him.

The said George B. Whitfield did have a large property when we married, and his father, William Whitfield, was a man of a large estate when he died. She does not know anything of Elizabeth Whitfield taking into her possession all the estate of her husband, as his administratrix on his death. He died in Marlborough District, South Carolina, some two or three years before I went to South Carolina, which was in 1820. He left only one kin, the said George B. Whitfield, who was my husband. The said George B. Whitfield left living at his death, nine children, to-wit: William S. Whitfield, born 18th April, 1814; Emily E. Whitfield, born Nov. 8th, 1815; George B. Whitfield, born 12th July, 1822, who died without issue. Henry H. Whitfield, born the 11th April, 1826; Dervitt C. Whitfield, born 22d February, 1828; Elizabeth Whitfield, born 19th July, 1830; Josephine Whitfield, born 19th November, 1832; John F. Whitfield, born 16th, 1836, and Flora Victoria Whitfield, born 5th of January, 1839, who also died without issue.

The said Elizabeth Whitfield and her slaves did not remove with the said Geo. B. Whitfield to Georgia, at the same time, but they removed to Georgia, at about a year afterwards. When we left she did not know she would move to Georgia

at all. She had not then become willing to move. None of the slaves of the said Elizabeth, came with me and my husband to Georgia, but they came about a year afterwards as before stated. Their names, as before stated, are as follows, to-wit: Hannah, Lidia, Binah, Stephen, Orange, Ailsy, Violet, Judy, Plymouth, Juny, Unity, Ann, Jansy, Taby, Dempsey and Daniel, also Moses, born on the way.

My husband did settle and live in Putnam county, Georgia, when he came from South Carolina, and he lived there about four years and he moved from Putnam to Houston county.

My husband, the said Geo. B. Whitfield, moved to Houston County in 1826, and he did, after the death of the said Elizabeth Whitfield, take her slaves to Houston county.— Her slaves that he carried to Houston county, were seventeen in number, and were the same that she brought with her from South Carolina. He carried to Houston, of his own slaves, thirty or forty, I do not remember the precise number, and of the estate of Elizabeth, seventeen, as I have just stated. After his removal to Houston county, the habits of the said Geo. B. Whitfield were dissipated in their character. They were intemperate, and his mind was at times much impaired by dissipation, so much so as to often render him unfit for business, and he was most of his time in that condition, under the influence of spirits, and unfit to transact business.

The negroes, after the sale, came back to the house and possession of the said George B. Whitfield, and remained there about a year, when, in the absence of the said George B. Whitfield, the said negroes were taken off by a man by the name of Green, so well as I recollect, who was acting as the agent of Everett, and carried to Everett's house and possession.

I saw the said negroes in the possession of the said Everett several times in his life time, and once since his death

I saw them in the possession of his estate.  I did visit the plantation of Everett since his death, in company with defendant to see said slaves, and ascertain how many were there.   When we first arrived, the overseer was not at home, and when we had gone round and seen nearly all the slaves, and got a list of their names and ages, of the younger ones, he came home and ordered us off, and when he learned from his daughter, I suppose, that we had a list of the names of the younger negroes, he said unless we give it up our horses were taken up and we should not go till he could get an officer and have us arrested, and abused my son and Mr. Blalock very much.   I at last gave up the list of the names and ages of the younger negroes to him, and we then got our horses, paid our bill for supper, &c., and left late in the night, after receiving this very unkind treatment and abuse from the overseer, as I have stated.   The overseer's name that was at Everett's plantation was Richard Clervis, as I afterwards learned.   It was about a year, after the said George B. Whitfield moved from South Carolina to Georgia, with his negroes and property, before the said Elizabeth Whitfield removed with her slaves to Georgia.

I do not remember anything more at this time, that will be in favor of the defendant, unless it be the fact that I know the said seventeen negroes, which I have before mentioned and described, were the property of the estate of the said Elizabeth Whitfield, and did not belong to the said George B. Whitfield.   I knew the negro boy Mose or Moses, belonging to Elizabeth Whitfield.   He was born on the road when the said Elizabeth was moving to Georgia from South Carolina in 1824, as well as I remember.

### Answer to Cross Interrogatories.

I am the mother of Henry H. Whitfield, and the widow and relict of George B. Whitfield deceased.   I have no interest in the event of this suit, that I am aware of, and never had any; and if I did have, before giving my testimony, I

have relinquished all that I might have had, and shall not be gainer or loser by its result.

I live in the city of Griffin, at my own house, and with my daughter. Geo. B. Whitfield died on the first day of April, 1839, in Hayneville, Lowndes County, Alabama. He lived in Houston County, I think, about seven years after May, 1828. He moved from Houston County, first to Henry County, Georgia, and from there to Lowndes County, Alabama. I did go in the company of Henry H. Whitfield and Richard Blalock, in the spring of 1854, to the plantation of James A. Everett's estate on Hog-crawl Creek, in Houston County, but I did not impose myself on Mrs. Clervis, the overseer's wife, in the absence of her husband, for we did not know he was absent until we had stopped. We asked to stay all night, and his wife gave us permission to do so. This is all the imposition that was used. We did, after getting supper, and before Mr. Clervis came home, go out to the negro houses in company with his daughter, his wife saying she was too unwell to go, but I did not point out the old negroes to Mr. Blalock, that I knew in South Carolina, for he knew the old negroes as well as I did. And the old negroes, at my request, did point out their children so that they might be identified by Mr. Blalock, and he has not testified from negro news, that I am aware of, in this case. And Mr. Clervis, when he came home and learned that we were trying to find out about the negroes, did order us all off, and took from me, not from my son, a memorandum that he had made. This was in the spring of 1854, and I have answered fully all these things.

He was wild, but in South Carolina I do not think he was much dissipated or of very irregular habits. He was inclined, I think, to drink and bet on horse races. I do not know that he gambled. I have answered truly and fully so far as I know.

George B. Whitfield became so intemperate as to affect his mind, when under the influence of spirits, in 1824 or 1825,

and he was from that period generally under the influence of spirits, and drank very hard up to the time of his death. His nearest neighbors that I suppose knew his situation, were John Highley, Daniel Pitts, John Matthews, William Cole, Nicholas Taylor and Daniel Whatly or Watly.   I believe when he was sober his mind was good enough to attend to his business as long as he lived in Houston or any where else, but he was not while in Houston, sober very long at a time.   He moved from Houston first to Henry County, Georgia, and then to Alabama.

George B. Whitfield, was the only child and heir at law, living, of Elizabeth Whitfield at her death.   I do know that at the death of Elizabeth Whitfield, she left any other child than George B. Whitfield.   She died in the year 1825.   The ages of old George B. Whitfield's children, are as follows: William S. Whitfield, born 18th April, 1814, Emily E. Whitfield, now Emily E. Veasey, born November 8, 1815, George V. Whitfield, born July 12, 1822, Chas. J. A. Whitfield, born Aug. 1, 1824, Henry H. Whitfield, born 11th April, 1826, De-Witt C. Whitfield, born 22d Feb, 1828, Elizabeth Whitfield now Elizabeth Spear, born 19th July, 1830, Josephine L Whitfield, now Josephine L. Williams, born Nov. 8, 1832, John F. Whitfield, born March 16, 1836, and Flora Victoria Whitfield, born Jan. 5, 1839.   Of these children, William is dead, leaving issue, Charles J. A. died before his father, leaving no issue, George V. is dead, leaving no issue, Flora Victoria is dead without issue.   Henry H. was born the 11th day of April, 1826.   I have given all their names, ages and sexes, and the time of George B. Whitfield's death was the first day of April, 1839, the place Haynesville, Lowndes County, Alabama.

I do not know who the Sheriff delivered the negroes to at the Sheriff sale in 1828.   They came back home the same day of the sale, to George B. Whitfield.   I do not know that Whitfield held the possession of said negroes, after said sale, upon hire, but to the best of my knowledge the fact was oth-

erwise, that he held by contract and agreement with Everett.

I have not stated anything in answer to the 19th direct interrogatory but what I know of my own knowledge, and I have not stated anything that was hearsay in answer to said interrogatory, except the overseer's name.

There is no person present when I am testifying and answering these interrogatories as well as the direct ones, but the Commissioners.

Defendant then read in evidence the deposition of Richard Blalock, taken by commission, who testified he knew Elizabeth Whitfield in her lifetime, and knew the other parties. I knew Elizabeth Whitfield, in Marlborough District, South Carolina, about twenty years before she left there, which was in 1823 or 1824. After she moved from there I never saw her again. I knew some negro slaves which she had when she lived in Marlborough, S. C., and which she carried away with her when she moved to Georgia. There was Stephen a boy, then two or three years old; Orange, a boy then over two years old; Plymouth, a boy then about on or two years old; Ailsey a woman then about forty years old; Jude, a girl, then some five or six years old; Jenny a girl, then 8 or 9 years old; Violet, age not remembered, (she has since died on James A. Everett's plantation in Houston County, Ga.); Hannah, a woman, then some 35 or 40 years old, she also died at Everett's; Dempsey, a boy, he is also dead; Binah, a girl, then some four or five years old, she is also dead. These are all I remember, at this time, of the negroes which Elizabeth Whitfield had while she lived in S. C. and when she left there. I have seen all of the negroes named above in the possession of Jas. A. Everett, in his lifetime, and of the defendants as executors since his death, except those which died before Everett, at least, I have seen them on Everett's plantation. I have seen some of the children of some of the above named negroes, also on the plantation of the said Everett, viz: George, a boy, about 18 years old; Tom,

a boy about 17 years old; Mary, a girl, about 10 years old; Betsy, a girl, about 4 years old, children of Jinney; Mose, about 30 years old, the son of Hannah. I do not remember the names of any other children. These children named, are also on the plantation of Everett's estate. The present value of the above named negroes, I believe to be as follows; Stephen is worth $1,000; Orange is worth $800; Plymouth, $900; Ailsey, worth nothing; Judge, worth $700; Jinney, is worth $800; Binah, was worth about the time she died, $200; George, worth $1,000; Mary, is worth $500; Betsey, is worth $300; Mose, is worth $1,000. I do not know anything about the situation and ownership of the property at the death of Mrs. Elizabeth Whitfield—know nothing now that will benefit the plaintiff (at law.)

Mrs. Elizabeth Whitfield, has been dead about twenty-nine years—(date of answers is 18th March, 1854.) I understood she died in Eatonton, Georgia. She lived in Putnam county, as I understood. Elizabeth Whitfield, was the mother of Geo. B. Whitfield. When I knew her, she lived to herself, two or three years after the death of her husband, and then again about a year before she came to Georgia. After she came to Georgia, I heard she lived with her son, Geo. B. I can say positively that I saw the negroes named above, in my answer to the 3rd direct interrogatory, and which I suppose are the subject of this suit, in the sole and exclusive possession of Mrs. Elizabeth Whitfield, about a year before she left South Carolina. It was in Marlborough District, South Carolina, about the year 1823, or 1824; she then lived in Marlborough, S. C. She lived by herself on her plantation. Their names, ages and sexes, are as follows, to the best of my recollection. Stephen, a boy, about two or three years old; Orange, a boy, about two years old; Plymouth, a boy, 1 or 2 years old; Ailsey, a woman about 40 years old; Jude, a girl, age not remembered; Jinney, a girl, about 5 or 6 years old; Violet, then about 8 or 9 years old;

Hannah, a woman, 35 or 40 years old; Binah, a girl, some 4 or 5 years old; I cannot state the month Elizabeth Whitfield died, but understood it was in 1825, at Eatonton, she died. I do not know that James A. Everett, bought at Sheriff's sale in 1826, 1827, 1828, or 1829, any negroes sold as the property of Geo. B. Whitfield, as I was not in this State during those years. I have heard, however, that he did buy some negroes but the number not recollected. I do not know whether George B. Whitfield, was in possession of said negroes before said sale or not. I do not know whether the negroes I have mentioned are some of the same or not. Everett has had the older set in possession, since I came to Georgia in 1831, and his possession has been peaceable and quiet, so far as I know. As to his possession before then, I don't know. He remained in possession till he died in 1847. I think Kendrick & Green, hold possession, as executors of James A. Everett. I do not know, from length of time, frailty of memory, age and infirmity, I am unable to testify as to the identification of the negroes. I have seen the principal part of the negroes occasionally, almost every week for the last four or five years, as I have been going to mill, and as they have passed my house going to work, &c. My age is about sixty-eight years. Can't say whether the Whitfields, Henry and William S., knew years ago that J. A. Everett, bought and paid for said negroes as George B. Whitfield's property. George was son of Elizabeth, and Wm. S. and Henry, sons of George. I do not know whether George B. Whitfield, in his lifetime had possession, and exercised control over said negroes at any time, except that two or three years before he came to Georgia, he and his, moved, lived, and there all worked together, but do not know that Elizabeth Whitfield lived to herself one year in S. C., her son George having moved to Georgia before she did, bringing his negroes, and leaving hers with her. How they lived after they came to Georgia, I do not know. I do not know any-

thing more that will benefit defendants (at law, and com-
plainants in equity.)

Defendant then read in evidence, the depositions of John
C. Ashburn, who testified that he knows the parties, and did
oversee the plantation and negroes for James A. Everett, in
the year 1847, until December in 1852; the said Everett died
as nearly as witness can remember on the 22nd of June,
1848. Witness says he knew on said plantation, in the pos-
session of said Everett whilst in life, and in the possession
and under the control and management of his executors
after his death, certain negroes that were called the Whit-
field negroes, that the said Everett got from Whitfield; that
he knew in the possesssion of said Everett whilst in life, and
on his plantation in the possession of his executors after the
death of said Everett, the following negro slaves, that were
known and designated on the plantation of said Everett, and
his estate, from January, 1847, to December, 1852, as the
Whitfield negroes, which were of the following ages and val-
ue, respectively, to-wit; Binah, 40 years old, worth $500;
Ailsey, 70 years old, worth nothing; Violet, 40 years old,
died in 1851, previously to her last illness, worth $600;
Jude, 35 years old, worth $650; Plymouth, 30 years old,
worth $1,100; Jake, 30 years old, worth $900; Hannah,
50, worth $100; Lydia, 65 years old, worth nothing,
rather an expense; children of Binah, Floyd, 14 years
old, worth $900; Cato, 12 years old, $850; Daniel, 6
years old, worth $300; Violett's children, Harry, 18 years
old, worth $1000; Rose, died at about 16 years old, previ-
ous to her last illness, healthy, considered worth $700; Lou-
isa, 14 years old, worth $800; Sarah, 12 years old, worth
$700 or 750; Lewis, 15 years old, worth $950; Bias, 10
years old, worth $500; Milly, 8 years old, worth $300, and
a boy, child of Violett, name not remembered, 6 years old,
worth $250. Children of Jude; Martha, 17 years old, worth
$750; Mima, 15 years old, worth $750; Eliza, 13 years old,
worth $700; and Jim 10 years old, worth $500. He knew Es-

ther and her two children, Cynthia and Lizzie; Esther, 50 years old, worth $100; her daughter Cynthia, 25 years old, worth $800, and he thinks has several children; Lizzie, 22 or 23 years old, worth $1,000. He does not know of his own knowledge, except from what he has heard Turner Everett say, that George B. Whitfield ever had in his possession any of the negroes named in the direct interrogatories. All he knows about the matters above testified to, is what he has heard Turner Everett, who was the agent and executor of James A. Everett, and others, to say in relation to the subject matter of inquiry, and it is therefore a matter of hearsay. It is usual and common when men buy land or negroes from A. or B., to call the land and negroes A. or B. land or negroes. He never knew any of the negroes named in the interrogatories in chief, to be in the possession of any person, other than the said James A. Everett, and his overseers in his lifetime, and in the possession of his executors and the overseers for the estate since the death of the said James A. Everett. He does not know how long the said James A. Everett had possession of said negroes previous to his death. The executors of said Everett, have had the possession of said negroes, so far as witness knows or believes, ever since the death of the said James A. Everett—does not know, but thinks that Everett and his executors have had the possession of said negroes some 15 or 25 years. He knows nothing more.

Defendant then read in evidence the depositions of Abner Burnam, one of the jurors—who testified from the prices fixed upon the negroes by the other witnesses.

Binah was worth annually, on an average, $55 from 1828 Violett, $65; Ailsey, 00; Jude, $75; Plymouth, $150; Hannah, $40; Lydia, 00; Mose, from 15 years of age, $125; Stephen, from 15 years of age, $125; Orange, $115; Jinney, $100; George, $100; Tom, $100; Mary, $40; Betsey, 00; Floyd, $100; Cato, $75; Dunn, 00; Harry, $100; Rose, $50; Louisa, $40; Sarah, $40; Lewis, $100; Bias, $50; Milly,

00; Boy Anderson, 00; Martha, 60 or 70, $65; Mima, $75; Eliza, $40; Jim, $50.

Mr. Burnam also testified, he considered young negroes able to earn their vituals and clothes before 14 or 15 years old, but not more, and that it is worth two hundred and sixty dollars a head to raise young negroes till they would earn their support; that he had known some of the names of the negroes in controversy, and worked with them on the road as far back as 1829 or 1830; they were then in James A. Everett's possession. Here defendant closed.

Complainant then read in rebuttal, so much of David Emanuel's testimony as showed the following: "that a negro man by the name of Mose, was owned and claimed by George B. Whitfield in South Carolina."

Complainant then introduced Mr. ———— Thompson, who testified that Harry, Lewis, Louisa, Rose, Bias, Sarah and Milly, are Violett's children; that Martha, Mima, Elizabeth and Jim, are Jude's children; that Floyd, Cato and Daniel, are Binah's children; that Daniel died before witness went there; that Rose and Charity are also dead.

Here the case rested, and after argument had, his honor Judge Lamar, presiding, charged the Jury as follows:

"The Counsel on both sides have in writing agreed to submit to the Jury, both the common law and equity cases together, for your adjudication. I give you the law applicable to the issue to be, that twenty years is an equitable bar, provided no legal disabilities exist so as to prevent a party from asserting his rights, but according to the statute of limitations at law, time does not run until administration is granted on an intestate's estate. But the rule which controls the question, in equity, is different as to the running of time, and therefore of its commencement. If, then, George B. Whitfield, died in 1839, and Everett acquired this property in 1828, no equitable bar existed against him, George B. Whitfield, during his life, as twenty years had not elapsed from the possession of the property by Everett, before Whit-

field's death.    And if Henry H. Whitfield the administrator and his brothers and sisters, were minors at the time of the death of George B. Whitfield, then this equitable bar ceased to run against them during their respective minorities, and such of them as were not of the age of twenty-one, until they arrived at that age.    Being under a legal disability to assert their rights, equity would not bar them.    If, however, from the time of the removal of this disability a sufficient time had elapsed which added to the period of time which had run against their ancestor, Geo. B. Whitfield, before his death, would make the period of 20 years, then an equitable bar would exist, and would furnish grounds for relief, provided, that you should believe from the evidence that no fraud existed on the part of Everett, and that his purchase was *bona fide.*    The Court goes even farther than the counsel for the complainants insist on, as their remedial rights if they solely rely on an equitable bar, and charge you that if Mrs. Whitfield died, leaving her estate as stated, and that if Geo. B. Whitfield, her sole heir, took possession of it as such, that he had an equitable right in it, although the legal title might at the same time exist in the estate of his mother, or in such person as might take out administration on the same—that Everett at any time during his life, could have enjoined Geo. B. Whitfield, either in his own right, or as administrator on his mother's estate, from attempting to recover said slaves, provided that George B. Whitfield knew of the sale, consented to it, and the appropriation of the money to his own use, and acquiesced in it, because it would be unjust and inequitable for him to have received the benefits of the sale thereby made, and then under color of his administration to recover the property back, and the Court further holds his heirs, or distributees, would be subject to the same rule, provided you should believe that there was no fraud committed by Everett in the sale or acquisition of the negroes.

But if from the evidence, you should believe the sale made by the Sheriff to Everett, was fraudulent and not *"bona fide,"*

and that Everett participated in that fraud, then neither he during his life, or his executors after his death, can have relief in equity, but is remitted back to their legal rights, whatever they may be, for it is a maxim, that he who comes into a Court of conscience, or this sacred temple invoking equity, must come in with clean hands and untainted with fraud. Equity says to the fraudulent, as the tree falls so it must lie —as you make your bed, so you must lie down in it. The Court intimates no opinion as to whether fraud has or has not been proven in the case, for this is the peculiar province of the jury—looking to all the facts proven or given in evidence by both parties. Fraud must be proven and not presumed, but it may be proven from circumstances, upon the effects of which you are the exclusive judges. The defendant's counsel asks me to instruct you, that when vendor or defendant in execution, after a judicial sale remain in possession of the property sold, it is evidence of fraud. I charge you that it is a badge of fraud. But this possession may be explained, as it only affords a presumption of fraud. If you find for the executors of Everett, you will decree, that the common law action be perpetually enjoined. If you find for the administrator of Elizabeth Whitfield, you will decree that the executor of Everett pay the value of the negroes, from the time which you believe, from the evidence, to have been converted by Everett, belonging to the estate of Elizabeth Whitfield, and the hire from the time of the conversion of the property by Everett. The negroes, which were in life at the time of the demand, will be included in your estimate of their value, although they may have died since, but not those which died prior thereto.

To which charges the complainants then excepted, and now here except and assign the same as error.

The jury retired and returned a decretal verdict for the defendant in the Bill, and plaintiff at law for the sum of thirty-seven thousand three hundred and twenty-six dollars.

Counsel for complainants having duly and regularly filed

in the Clerk's office a brief of evidence agreed on by counsel on both sides moved the Court, on Saturday morning, the sixth day of November, 1858, during the sitting of said Court, having served the defendant's Solicitor with the grounds of the motion for a new trial on the following grounds:

1st. Because defendant could not recovery, in this bill, nor was he entitled to a decree on complainants' bill, which was merely defensive, and to entitle defendant to a recovery, a cross bill was necessary, and the Court erred, when complainant's counsel urged this objection on the trials, in ruling otherwise.

2d. Because the Court erred in charging the jury, "that twenty years is an equitable bar, provided no legal disabilities exist so as to prevent a party from asserting his rights, but according to the statute of limitations at law, time does not run till administration is granted on the intestate's estate, but the rule which controls the question in equity is different, as to running of time, and the time of its commencement. If then George B. Whitfield died in 1839, and Everett acquired this property in 1828, no equitable bar existed against George B. Whitfield during his life, and if Henry H. Whitfield, the administrator, and his brothers and sisters were minors at the time of the death of the said George B. Whitfield, then his equitable bar ceased to run against them during their respective minorities, or such of them as were not of the age of twenty-one years, until they arrived at that age, being under a legal disability to assert their rights equity would not bar them.

3d. The Court erred in further charging the jury, "If, however, from the time of the removal of the disability, a sufficient time had elapsed, which added to the period of time which had run against their ancestor, George B. Whitfield before his death, would make the period of twenty years then an equitable bar would exist and would furnish grounds for relief, provided you should believe no fraud existed on the part of Everett, and that his purchase was *bona fide*;

there being no evidence of fraud, and the said charge being otherwise erroneous.

4th. The Court also, erred in that part of its charge, modifying the equitable bar of George B. Whitfield and his heirs, to twenty years. Also, qualifying so as to say, "provided there was no fraud on the part of Everett," there being no fraud proven.

5th. The Court also erred in charging that, "If from the evidence, the sale to Everett made by the Sheriff, was fraudulent and not *bona fide*, and that Everett participated in the fraud, then, neither he, during his life time, nor his executors after his death, can have relief in equity, but is remitted back to their legal rights whatever they may be, for it is a maxim that he whoever comes into equity, must come with clean hands, and untainted with fraud."

6th. The Court erred in submitting the question of fraud to the jury in this case.

7th. Because the jury found contrary to law and that portion of the charges of the Court most favorable to complainants.

8th. Because the jury found contrary to the evidence, the weight of evidence and against evidence.

9th. Because the jury found contrary to the justice and equity of the case.

10th. Because the jury found contrary to and without evidence.

And after argument had on said motion for new trial, the Court overruled the motion on each and every ground taken therein, to which rulings of the Court, overruling the motion for new trial, complainants except and assign the same as error, as well also, as the various other rulings of the Court, and as the facts aforesaid do not appear of record—now come the plaintiffs in error, by their counsel James J. Scarborough and George R. Hunter, on this ———— day of ———— in the year of our Lord eighteen hundred and fifty-eight, and within thirty days from the adjournment of the said Court, and

tender this their bill of exceptions, and pray that the same may be certified according to the statute in such case made and provided.

JAS. J. SCARBOROUGH; GEO. R. HUNTER; POE & GRIER, for plaintiffs in error.

S. T. BAILY; and E. A. NISBET, *contra.*

*By the Court.*—BENNING, J. delivering the opinion.

The first questions are on the charge of the Court.

A part of the charge of the Court, was to this effect—that, the period of the adverse possession of negroes, necessary to bar the equitable title to them, of next of kin, is twenty years; but that, if, before the lapse of the twenty years, the title comes to persons who are minors, the time during which, they remain minors, is not counted; and that, consequently, the period in that case, is more than twenty years, viz: is the term from the accrual of the title, to its coming to the minors, plus the subsequent term during which, they remain minors; plus such a term afterwards, as shall be sufficient, when added to the first term, to make twenty years. The latter portion of this charge, was excepted to—but we think, that it was not erroneous.

Equity in general, follows the law in respect to the statute of limitations; and the law says, that the "statute of limitations, when it has commenced running, shall not so operate as to defeat the interest acquired by idiots, lunatics, or infants, after its commencement, but the operation of said statute shall cease until the disability or disabilities of such persons are removed, or from the time of the arrival of such infant to the age of twenty-one years." *Stat. of* 1817, *Pr. Dig.* 578. We see nothing in this case to take the case out of the general rule.

The exception to the former part of this charge; viz, to the part stating twenty years as the period of the " equitable bar."

That is, as the period that would have to elapse, before an administration would be presumed, was hardly insisted on. Indeed, the bill itself says, that there never was any administration, until that by Henry H. Whitfield, consequently one could not be presumed. And even if this were not so, we incline to think that the charge would still be right.

Another part of the charge, was, in substance, that if Geo. B. Whitfield was the sole heir of Mrs. E. Whitfield, his mother, he had an equitable right to take possession of the negroes of her estate ; and if they were sold under *fi. fas.* against him, and sold with his consent, and bought by Everett, the title to them acquired by Everett, would be good against, not only Geo. B. Whitfield and his heirs, but also against an administrator of his mother—provided, there was "no fraud committed by Everett, in the sale or acquisition of the negroes." Exception was taken to the proviso in this part of the charge ; and the ground assumed for the exception, was, that there was nothing in the evidence to authorize the Court, to insert such a proviso. The question therefore, is, whether that ground was true—whether there was any thing in the evidence, tending to show fraud, as the means by which, Everett acquired the negroes,—fraud on George B. Whitfield ?

We may assume that fraud was the means by which, Everett acquired the negroes, if the manner by which he acquired them, was some such manner as the following, namely—He and Whitfield agreed, that the negroes of Whitfield, thirty-two in number, should be sold in "a lump," under the *fi. fas.* against Whitfield, although the negroes were worth much more than the amount due on the *fi. fas.* ; that he, Everett, should bid them in, satisfy the *fi. fas.*, and, to secure himself, receive an absolute bill of sale for the negroes, from the Sheriff, and, at a certain time afterwards, take possession of the negroes and keep such possession until his advance was repaid to him, by the labor of the negroes or otherwise. Accordingly, the thirty-two negroes were so sold in a lump.

Everett bid them in; satisfied the *fi. fas.*; received an absolute bill of sale for them from the Sheriff; and, at the end of the year, took possession of them. The labor of the negroes was of sufficient value to repay Everett's advance, by the end of a certain number of years afterwards, say ten or twelve. When this time arrived, Everett, instead of delivering back the negroes to Whitfield, set up an absolute claim to them, and commenced holding them, adversely to Whitfield. I say, that if the way by which, Everett acquired the negroes, was some such way as this, we may assume, that he acquired them by fraud. His refusal or failure to carry out the bargain, by a redelivery of the negroes, would be evidence sufficient to authorize the inference of an original fraudulent intent in him.

Now if there was any thing in the evidence, going to show, that this was the kind of way in which, Everett acquired the negroes in question—they being a part of the thirty-two—then, it is not true, as the exception assumes it to be, that there is nothing in the evidence, to warrant this charge as to fraud.

Was there, then, any thing in the evidence, going to show, that this hypothetical way was the real way by which Everett acquired the negroes? We think that there was.

First, it is in the evidence, that the whole thirty-two negroes were sold "in a lump," under a *fi. fa.* against Whitfield; that they were bought by Everett, at $6,791, not half their value; that Whitfield was present at the sale; that the negroes, after the sale, returned into Whitfield's possession, and remained in his possession until the end of the year; and that at the end of the year, possession of them was taken by Everett, who kept it until his death in 1847, or 1848, and, that possession of them has continued, ever since his death in his executors; and, that Whitfield died in 1839, worn out by drink—a habit which was on him at and before the sale to Everett.

Now from these facts alone, we are authorized, we are required, to presume, that there existed, between Everett and Whitfield, an arrangement of some sort by which, they and the Sheriff were acting. Had it been merely the law by which, all parties were acting, the course of events would have been quite different. The Sheriff would not have dared to put up to sale, the thirty-two negroes " in a lump"— and if he had done so, Whitfield would, probably, have protested against it; nor would he have delivered the negroes back to Whitfield; nor would Everett have acquiesced in his doing so, if he had attempted it, but he would have delivered them to Everett, the purchaser, and he in all probability would have carried them to his own home, immediately, and not have waited until the end of the year, before he did so. These facts, then, of themselves, require us to presume, that there existed some arrangement between Everett and Whitfield by which, Everett obtained the negroes. I may go further,—they require us to presume, that that arrangement was one by which, Everett was to acquire no more than a partial interest in the negroes—an interest inclusive of the right to have possession of the negroes and to receive the proceeds of their labor, in satisfaction of, or as security for, the money advanced by him, for Whitfield. And to presume the arrangement to have been such a one as this, is to presume it to have been identical, in substance, with the arrangement assumed in hypothesis.

Everett failed to redeliver the negroes, at the time at which, the proceeds of their labor, amounted to a sufficient sum to pay off his advance; but still kept them as his own. Such conduct in him, supposing the arrangement to have been as aforesaid, was sufficient to warrant the inference, that he was actuated, from the beginning, by a fraudulent purpose.

Thus then, these facts being in the evidence, there was enough in it, as we think, to justify the charge about fraud.

Secondly : But there is more in the evidence. West, who was Everett's overseer, the year in which the Sheriff's sale

took place, says, that Whitfield "wanted Everett to take up the executions, and take a mortgage on his negroes," that Whitfield urged "Everett to take up said executions, and take control of them." "He heard nothing about selling property." The witness is speaking of a conversation in his presence, between Whitfield and Everett.

This goes to show, at least, what Whitfield's wishes were, viz: that Everett should pay his debts, and take his negroes as security for reimbursement. And if these were his wishes, we may safely say, that Everett's purchase of the negroes in "a lump," at half price or less, was not an absolute purchase; for an absolute purchase would not have answered Whitfield's wishes, and he had it in his power, to prevent a purchase on any such terms—he had it in his power, to require the Sheriff to sell the negroes to the best advantage—and, therefore, to require him, not to sell them in "a lump." We are, then, at liberty to infer, that Everett acceded to Whitfield's wishes.

Thirdly; the answer to the bill, sets up an understanding between Everett and Whitfield, of which, we may say, in general terms, that it was an understanding by which, Everett was to pay off the *fi. fas.* against Whitfield, and have the negroes as a security for his reimbursement. It is true, that the answer in this particular is put, on information and belief—but then the bill calls for an answer on information and belief, and the answer in this respect, merely responds to the call—for it is responsive to the allegations in the bill, as to the manner in which, Everett acquired the possession of the negroes.

We think, then, that there *was* in the evidence, a number of things going to show, that the mode in which Everett acquired the negroes, was the hypothetical mode aforesaid, or some similar mode; and consequently, we think, that there was matter in the evidence, to warrant the charge of the Court as to fraud.

Another part of the charge, and a consequence of the part

last noticed, was, that if Everett acquired the slaves by a fraud on Whitfield, equity would not aid him or his representatives, to hold them, against Whitfield or his representatives. This was the substance. This part was not, I believe, questioned. Certainly, it ought not to be, as we think.

Another part of the charge, was in these words. "The Court intimates no opinion as to whether fraud has or has not been proven in the case, for this is the peculiar province of the jury—looking to all the facts proven or given in evidence, by both parties. Fraud must be proven and not presumed, but it may be proven from circumstances upon the effects of which, you are the exclusive judges." This part was excepted to, as "submitting the question of fraud to the jury." But as we understand the part, it merely submits the question of the *weight* of the "circumstances," to the jury. True, the word used, is "effects." "Upon the effects of which" [circumstances] "you are to be the exclusive judges." This is no more than saying, weigh the circumstantial evidence—for to do that is your exclusive province.

Another part of the charge, was in these words. "The defendant's counsel asks me to instruct you, that where a vendor or defendant in execution, after a judicial sale, remains in possession of the property sold, it is evidence of fraud. I charge you that it is a badge of fraud." Exception was taken to this part of the charge, and the ground on which the exception was put, was, not that the proposition of the Court was not true, but that there was nothing in the case to authorize the Court to state the proposition to the jury; that there was not in the case, any matter out of which, could be made a question of defrauding creditors of Mrs. Whitfield, by what took place between Geo. B. Whitfield and Everett.

But, in strictness, this ground is not true. It was in proof, that old Mrs. Whitfield's estate was still in debt a small sum, $50, to one Blalock, who had been her overseer. Geo. B. Whitfield was her only heir, and it was a possible thing, that

Ex'ors of Everett vs. Adm'rs of Whitfield.

he, by the arrangement with Everett, intended to defeat the collection of this debt.   If he did so intend, that of itself made the arrangement fraudulent as to Blalock; and Blalock had the right to insist on it, as a ground of setting aside the arrangement.   True, there may have been other and sufficient grounds also open to him for setting aside that arrangement, but a man has the right to rely on all his grounds of attack or defence.   And Henry H. Whitfield, the party suing, was the administrator of Mrs. Whitfield, and as such, he both represented Blalock, her creditor, and had the *legal* title to the negroes.   Geo. H. Whitfield not having been able to pass more than the equitable title to them, to Everett. Therefore, it was competent for Henry H. Whitfield, to assert this ground for Blalock.

So much for the question on the charge of the Court.

The motion for a new trial repeated the exceptions to the charge, and added to them some others all of which latter, may be reduced to this, that the verdict was contrary to the evidence in two particulars, one, that the evidence showed the action, barred by lapse of time—the other, that the evidence showed the verdict, much too large.

As to the first of these two particulars.   If it be true, that Everett acquired the negroes from Whitfield, under an arrangement by which, he was to pay off the *fi. fas.* against Whitfield, and take possession of the negroes, and hold them, as security for his reimbursement, until their accumulated labor or hire, should be equal to the amount advanced by him, then, time, whether at law, or in equity, did not begin to run against Whitfield, until the accumulated hire and labor had become equal to the amount advanced by Everett, with interest, and, perhaps, not then, unless Everett then notified Whitfield, that he claimed the negroes as exclusively his own.   When this time would come, would of course depend on two things, the amount of Everett's advance, and the annual amount of the labor or hire of the negroes.   The evidence shows, that Everett's advance amounted to, at least

$6,791, for the Sheriff's return says so, and also says, that this sum was applied, (to older *fi. fas.*)

The advance may have amounted to more—to a sufficient sum to pay off all the *fi. fas.* against Whitfield; and it must have done so, if the arrangement between the two men was the one above supposed, and if it was carried out faithfully, by Everett.   It is at least certain from the evidence, that the sum advanced by Everett, was a large sum.   We may assume, therefore, I think, that it would take some ten or twelve years, for the annual hire of the negroes to pay it off with the interest.   Then we may say, that the advance was not paid off till say, 1839, or 1840.   The suit in trover was commenced on the 30th of September, 1853—that is, within less than twenty years, from the probable time at which, the hire paid off the advance, and, therefore, within twenty years from the first moment at which, time could commence running against Whitfield.   The suit, then, was not barred by time, if there was such an arrangement, as the one supposed, between Everett and Whitfield.   And we think, as has been already disclosed, that there was considerable evidence, going to show, that such an arrangement as that did exist between them.

Consequently, we cannot say, that we think it true, that the evidence showed the verdict, barred by lapse of time.

Is it true, that the evidence showed the verdict, much too large ?

The verdict was large, but, on a careful examination of the evidence, we think, that it was not too large.   If we take the value of the living negroes sued for, exclusive of the value of the dead ones, Violet, Rose, Binah and Hannah, and add to this value so taken the hire of the negroes, inclusive of the hire of the dead ones up to their death, and from the sum deduct the expense of raising the young negroes, we shall have about the amount of the verdict.   And ought not Everett's executors to be satisfied with this way of coming at what should be the amount of the verdict ?   We think they

ought; for it is by no means clear, that they are not liable for the value of the dead negroes.

It is true that in this mode of calculation, they get no credit for the amount advanced by Everett, for Whitfield. But then on the other hand, the suit is but for a part, and much the smaller part, of the negroes received by Everett; and, in the absence of proof from his side, it is fair to presume, that this larger part of the negroes, which he or his representatives still retain, is sufficient to balance that amount.

Upon the whole then, we cannot say, that any of the exceptions appear to us, to be sufficient.

Judgment affirmed.